**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID FRANKLE and MARIA SALINAS, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>HOLLISTER CO., and ABERCROMBIE & FITCH CO.,<br><br>     Defendants. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY UNDER CALIFORNIA'S CONSTITUTION; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; UNJUST ENRICHMENT; AND TRESPASS TO CHATTELS<br><br>JURY TRIAL DEMANDED |

- 1 -
CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................3

THE PARTIES ...................................................................................................................5

JURISDICTION AND VENUE .........................................................................................5

SUBSTANTIVE ALLEGATIONS ....................................................................................6

    A.    Defendants Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers. ...........................................................................................6

    B.    Defendants Falsely Informed Users That They Could Reject the Website's Use of Cookies. .................................................................................................................11

    C.    The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendants' Website. .................................................19

        1.    Google and Tealium Cookies .................................................................19

        2.    Adobe Cookies ........................................................................................24

    D.    The Private Communications Collected are Valuable. ...........................................33

PLAINTIFFS' EXPERIENCES ........................................................................................34

CLASS ALLEGATIONS ..................................................................................................40

CAUSES OF ACTION ......................................................................................................42

    First Cause of Action: Invasion of Privacy.........................................................................42

    Second Cause of Action: Intrusion Upon Seclusion...........................................................45

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631).................................................................................46

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ......................................................51

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation................53

    Sixth Cause of Action: Unjust Enrichment ........................................................................55

    Seventh Cause of Action: Trespass to Chattels .................................................................56

CLASS ACTION COMPLAINT

Plaintiffs David Frankle and Maria Salinas ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Hollister Co. and Abercrombie & Fitch Co. ("Defendants" or "Hollister"). Plaintiffs' allegations against Defendants are based upon information, belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

## INTRODUCTION

1.      This Class Action Complaint concerns an egregious privacy violation and total breach of consumer trust in violation of California law. When consumers visit Defendants' ecommerce website (https://www.hollisterco.com, the "Website"), Defendants display to them a popup cookie consent banner. Defendants' cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendants assure visitors that they can choose to configure their cookie preferences by clicking the "Confirm My Preferences" button as shown in the following screenshot:



2.      Like most internet websites, Defendants designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies

CLASS ACTION COMPLAINT

and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. However, unlike other websites, Defendants' Website offers consumers a choice to browse without being tracked, followed, and targeted by third party data brokers and advertisers. But Defendants' promises are outright lies, designed to lull users into a false sense of security. Even after users elect to configure their preferences and opt out of all but essential cookies (including those that share or sell personal data), Defendants surreptitiously cause several third parties—including Google LLC (DoubleClick) and Adobe Inc. (omtrdc.net) (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and eavesdrop on users' private communications on the Website.

3.      Contrary to their express rejection of non-essential cookies and tracking technologies on the Website, Defendants nonetheless caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs' and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These third-party cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

4.      The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

5.      This type of tracking and data sharing is exactly what the Website visitors who clicked or selected the "Confirm My Preferences" button and opted out of all non-essential cookies (including those that share or sell personal data) sought to avoid. Defendants falsely told Website users, including Plaintiffs, that they respected users' privacy and that users could avoid

tracking and data sharing when they browsed the Website. Despite receiving notice of Plaintiffs' and consumers' express declination of consent, Defendants defied it and violated state statutes, tort duties, and also breached their contractual duties and the implied covenant of good faith and fair dealing with Plaintiffs and those similarly situated Website users.

## THE PARTIES

6.      Plaintiff David Frankle is, and was at all relevant times, an individual and resident of Oakland, California. Plaintiff intends to remain in California and makes his permanent home there.

7.      Plaintiff Maria Salinas is, and was at all relevant times, an individual and resident of Bakersfield, California. Plaintiff intends to remain in California and makes her permanent home there.

8.      Defendant Hollister Co. is a Delaware corporation with its headquarters and principal place of business in Illinois.

9.      Defendant Abercrombie & Fitch Co. is a Delaware corporation with its headquarters and principal place of business in Ohio.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and each Defendant are citizens of different states.

11.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California. Each Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Each Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12.     Further, the Private Communications and data which Defendants cause to be transmitted to Third Parties are routed through servers located in California. For example, as of

CLASS ACTION COMPLAINT

August 24, 2025, requests to the Website's domain name from a California location were received by a server located at 151.101.65.91, located in or near San Francisco:

| Request URL | https://www.hollisterco.com/api/bff/customer?brand=hol&catalogId=10201&country=US&langId=-1&store=h-us&storeId=10251&operationName=SIGN_IN_TOASTER_QUERY&variables=%7B%7D&extensions=%7B%22persistedQuery%22%3A%7B%22version%22%3A1%2C%22sha256Hash%22%3A%22ed26e36bab3f7d049f14a66baa7ca1bc4b5b067b5d2c0a5ad87374251414a0bb%22%7D%7D |
| Request Method | GET |
| Status Code | 🟢 200 OK |
| Remote Address | 151.101.41.91:443 |

**IP2Location Results**          Copy IP2Location Results

IP Address: 151.101.41.91

ASN: 54113

City: San Francisco

State/Region: California

Country: United States of America

Postal Code: 94107

(IP source: https://www.whatismyip.com)

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of California, including within this District.

14.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

**A.     Defendants Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers.**

15.     Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request

tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address so that the Website server knows where to send the HTTP response.

16.     An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

17.     Defendants' privacy policy confirms that they "use various technologies to learn your geographic location, including by collecting your IP address or other device information." As a result, Defendants knew that the device or devices used by Plaintiffs and Class members to access the Website were located in California.

18.     Defendants voluntarily integrated "third-party resources" from the Third Parties into Website programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendants' use of the third-party resources on the Website is done so pursuant to agreements between Defendants and those Third Parties.

19.     The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which causes the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, causing the website

CLASS ACTION COMPLAINT

to identify the device making the requests, and to record a session showing how the user interacts with the website.

20.     First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

21.     A third-party cookie is set by a third-party domain/webserver (e.g., td.doubleclick.net; omtrdc.net, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

22.     As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, causing them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendants, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

CLASS ACTION COMPLAINT

- **User Input Data**: The information the user entered into the Website's form fields, including search queries,[1] the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

23. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase

---

[1] The Website includes a "search" function in which users can input specific inquiries.

CLASS ACTION COMPLAINT

preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost website performance and revenue through the collection, utilization, and dissemination of user data and/or user profiles.

24.     Defendants specialize in consumer clothing, primarily selling casual apparel, accessories, and fragrances for men and women. Defendants own and operate the Website, which allows visitors to receive information about its products and purchase products. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendants, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

25.     Defendants chose to install or integrate their Website with resources from the Third Parties that, among other things, use cookies.  Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendants incorporate into their Website, or that Defendants cause to be loaded. Because Defendants control the software code of the Website, and are capable of determining whether a user is accessing the Website from California, they have complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

26.     Defendants explained the third-party cookies they used on the Website as follows in the Hollister Privacy Notice:

> HCo uses cookies (small files stored on your device or browser), pixel tags (tiny graphic images embedded in a website or email), and other similar technologies to automatically collect information when you visit or interact with our Platforms, or interact with our emails. Through the use of cookies, we may link information about your interactions with our Platforms or emails over time. We also contract

with third party advertising or analytics companies to serve you online ads on other websites. These companies use cookies or similar technologies to collect information about your interactions with our Platforms and interactions with other websites. These advertising companies may use and share the information gathered to deliver ads more tailored to your interests. We receive aggregate information from these third parties to understand our advertising effectiveness. Any information collected by us or by third parties through the use of cookies or similar technologies may be linked with other information we collect about you.[2]

**B.**    **Defendants Falsely Informed Users That They Could Reject the Website's Use of Cookies.**

27.    When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "Tracking technologies, such as cookies, are important for the correct functioning of our website. By clicking 'accept' you are directing us to use optional third party tracking technologies. You can configure your preferences and see a list



---

[2] Hollister Privacy Notice (Last Updated and Effective Date: 03/07/2024) (current version available at https://www.hollisterco.com/shop/CustomerService?pageName=privacy&textKey=LEGAL_PRIVACY_POLICY&storeId=10251&catalogId=10201&langId=-1). Defendants have subsequently updated their Privacy Notice but, based on information and belief, this version was in effect at the time of Plaintiffs' rejection of cookies on the Website.

For avoidance of doubt, Plaintiffs did not read the privacy policy. It is included here for purposes of defining cookies.

of third party tracking technologies, by clicking on the 'Confirm My Preferences' button." The banner then purported to provide users the opportunity to "Confirm My Preferences" as shown, in the following screenshot from the Website:

28.    Plaintiffs and other Website users who clicked or selected the "Confirm My Preferences" button, are presented with the cookie consent preferences window depicted in the screenshots below. The window represented to users that "Based on your state of residence, you may have the right to direct us not to 'sell' or 'share' (as defined under applicable law) your information to third parties for purposes of cross-context targeted advertising. ... To turn off cross-context targeted advertising, toggle Sale or Share of Personal Data to 'off' and click Confirm My Preferences."



CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



29.     After users moved the toggle to off, indicating their choice and/or agreement to reject all non-essential cookies, including those that share or sell personal data, and clicked "Confirm My Preferences," the popup cookie consent banner and cookie consent preferences window disappeared and they could then continue to browse the Website.

30.     Defendants' popup cookie consent banner and cookie consent preferences window led Plaintiffs, and all those Website users similarly situated, to believe that they

CLASS ACTION COMPLAINT

declined or rejected all non-essential cookies and tracking technologies, especially those that used for targeted advertising. The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendants would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon toggling off "Share or Sale of Personal Data" in the cookie consent preferences window.

31.    Defendants' representations, however, were false. In truth, Defendants did not abide by Plaintiffs' or other Website users' wishes. When Plaintiffs and other Website users clicked toggled off "Share or Sale of Personal Data" in the cookie consent preferences window, they provided notice to Defendants that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website. Nevertheless, Defendants caused the Third Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

32.    In particular, when users toggled off "Share or Sale of Personal Data" in the cookie consent preferences window, Defendants nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, causing them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendants failed to prevent cookies from being transmitted to Third Parties, causing them to track user behavior and communications.

33.     Some aspects of the operations of the Third Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties even after the user toggled off "Share or Sale of Personal Data" in the Website's cookie consent preferences window.



CLASS ACTION COMPLAINT

34.    The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third party websites while the user visited and interacted with Defendants' Website at

https://www.hollisterco.com. The screenshots depict only network traffic occurring *after* the user rejected all non-essential cookies in the cookie consent preferences window. As shown above, despite the user's rejection of all non-essential cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like td.doubleclick.net; omtrdc.net, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that the Website caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers toggled off "Share or Sale of Personal Data" in the cookie consent preferences window. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all non-essential cookies.

35.    Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

36.    As users interact with the Website, even after toggling off "Share or Sale of Personal Data" in the cookie consent preferences window, thereby declining or rejecting the use of non-essential cookies and similar technologies for targeted advertising, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data.  The third-party cookies that Defendants wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and

demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits, including sensitive or private information, and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

37.    The Third Party code that the Website causes to be loaded and executed by the user's browser becomes a wiretap when it is executed because it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties, each has the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

C.    **The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendants' Website.**

1.    **Google and Tealium Cookies**

38.    Defendants cause third party cookies to be transmitted to and from Website users' browsers and devices, even after users reject all non-essential cookies (including advertising and analytics cookies) to and from the **doubleclick.net** domain. This domain is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[3] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[4] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have

---

[3] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[4] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[5]

39.    Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[6] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

40.    Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[7] "To measure a website . . . [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect . . . information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page,

---

[5] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[6] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

[7] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

CLASS ACTION COMPLAINT

clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[8]

41.     Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[9]

42.     For example, the Google software code that Defendants cause to be stored on and executed by the Website user's device causes the following data to be sent to Google's domain, at https://cm.g.doubleclick.net:

---

**8** Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

**9** *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).



CLASS ACTION COMPLAINT

43.     According to Google, the "IDE" cookie is an "advertising" cookie, used to show Google ads on non-Google sites and "to personalize the ads you see."[10]

44.     The "user-agent," "sec-ch-ua," and "sec-ch-ua-platform" parameters inform Google of the device, browser, and operating system that the user has used to access the Website.

45.     The post above—which was caused by Defendants' configuration of the Website—was initiated by software code developed by Tealium, an online advertising company. The parameter "tealium_vid" is the "Tealium Visitor ID," which is an identifier that Tealium uses for the specific user and device. Tealium likely initiated the post in order to link the Tealium Visitor ID with Google's advertising ID, enabling both parties to track and target advertisements to the user. As shown above, the "tealium_account" belongs to "abercrombie-hco"—a clear reference to Defendant Abercrombie & Fitch Co. Defendants could have prevented all of this by honoring users' opt-outs.

46.     Finally, although not depicted above, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

47.     Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, interests, etc.), and to perform targeted advertising and marketing analytics.

48.     Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits

---

[10] *See* https://policies.google.com/technologies/cookies?hl=en-US. *See also* https://business.safety.google/adscookies/.

travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[11]

49.    Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[12] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

### 2.    Adobe Cookies

50.    Defendants also cause third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to opt out of cookies, to and from the **demdex.net** and **omtrdc.net** domains. These domains are associated with Adobe Inc.'s Audience Manager, a data management platform, Adobe's Marketing Cloud, and Adobe's

---

[11] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

[12] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

Experience Cloud Identity Service, a service which provides a universal, persistent ID to identify visitors across all Adobe products.

51.     These cookies are used to assign a unique identifier to each site visitor, which enables Adobe to consistently recognize and track users across different sessions and domains (i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and evaluate user behavior online.[13] These cookies enable Adobe to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit history; (v) user input data such as search inquiries; (vi) interests and preferences; and (vii) session information.[14]

52.     Adobe aggregates this cookie data with other data from multiple channels and devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics, create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[15]

53.     Defendants have configured a subdomain they own and/or operate, at smetrics.abercrombie.com,         to         point         directly         to         Adobe's         endpoint, Abercrombie.com.ssl.d1.sc.omtrdc.net:

---

[13] *See, e.g.,* Adobe Experience League: Adobe Analytics cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics); *see also* Adobe Experience League: Audience Manager cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager).

[14] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-components/components-data-collection).

[15] *See, e.g.,* Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).

CLASS ACTION COMPLAINT

(result from mxtoolbox.com)



(result from dnschecker.org)

54.    The omtrdc.net domain is owned and operated by Adobe, and functions as a tracking server for Adobe Analytics.[16]

55.    For example, when a user views Men's activewear on the Website, the Website causes the following type of data to be sent to Adobe Analytics at abercrombie.com.ssl.d1.sc.omtrdc.net, via the smetrics.abercrombie.com subdomain:

---

[16] *See* https://experienceleague.adobe.com/en/docs/target/using/integrate/a4t/analytics-tracking-server

CLASS ACTION COMPLAINT

| Key | Value |
|---|---|
| AQB | 1 |
| ndh | 1 |
| pf | 1 |
| t | 22/4/2024 20:3:3 3 240 |
| sdid | 66F48501531A20D4-5E01B0E80E2D588F |
| mid | 2524865135105749829251125592573288934 1 |
| aamlh | 9 |
| ce | UTF-8 |
| cdp | 2 |
| pageName | hol:hol:category:activewear:men's activewear::::grid |
| g | https://www.hollisterco.com/shop/us/activewear-mens-activewear |
| r | https://www.hollisterco.com/shop/us/womens |
| cc | USD |
| events | event58 |
| products | ;category;;;;eVar5=610530781 |
| aamb | RKhpRz8krg2tLO6pguXWp5olkAcUnlQYPHaMWWgdJ3xz PWQmdj0y |

CLASS ACTION COMPLAINT

| | |
|---|---|
| v1 | 10251 |
| c3 | category |
| v3 | guest |
| c4 | hol |
| v4 | USD |
| c5 | us |
| c6 | 610530781 |
| c7 | category |
| v9 | ,C0001,C0002,C0003, |
| c10 | Desktop |
| v11 | 018fa2bf0cd2000e8efffd1a73f905075002306d009dc |
| c17 | en-us |
| c23 | hol:hol:category:activewear:men's activewear::::grid |
| c30 | https://www.hollisterco.com/shop/us/activewear-mens-activewear |
| c32 | 018fa2bf0cd2000e8efffd1a73f905075002306d009dc |
| v43 | 2fe5a9c530e542ef41c5854251d167 |
| c45 | en |
| c51 | navigation-main nav-hol-610530781 |
| c53 | 1512x982 |
| c62 | 0 |
| v64 | hol:hol:category:women's:::::grid |
| c65 | c=CC-1 |
| c71 | false |
| v71 | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/123.0.0.0 Safari/537.36 |

CLASS ACTION COMPLAINT

| | |
|---|---|
| v72 | en |
| v75 | 2524865135105749829251125592573289341 |
| c. | |
| a. | |
| activitymap. | |
| page | hol:hol:category:women's:::::grid |
| link | Men's Activewear |
| region | fragment_24a5f73 |
| pageIDType | 1 |
| .activitymap | |
| .a | |
| .c | |
| pid | hol:hol:category:women's:::::grid |
| pidt | 1 |
| oid | https://www.hollisterco.com/shop/us/activewear-mens-activewear |
| ot | A |
| s | 1512x982 |
| c | 30 |
| j | 1.6 |
| v | N |
| k | Y |
| bw | 838 |
| bh | 752 |
| mcorgid | 92D21C8B532954A90A490D4D@AdobeOrg |
| AQE | 1 |

56.     The "mid" parameter is Adobe's unique user identifier that persists across sessions, used to identify a visitor in the Adobe ecosystem.[17]

57.     Various parameters correspond to the names and urls of pages that the user is currently visiting, or visited previously. For example, the "pageName," parameter informs Adobe that the user is viewing a page pertaining to men's activewear. The parameters also inform Adobe that the user has viewed pages pertaining to women's clothing.

---

[17] *See* https://experienceleague.adobe.com/en/docs/analytics/components/metrics/unique-visitors

CLASS ACTION COMPLAINT

58. When a user enters "underwear" into the search bar on the Website, the Website causes the following type of data to be sent to Adobe Analytics at omtrdc.com:



59.    As seen above, the "url" data that is sent to Adobe includes the search term entered by the user.

60.    Along with this data, the Adobe software code that Defendants cause to be stored on and executed by the user's device causes the following cookies to be sent to Adobe:

| Request | Header Query Body Cookies Raw Summary + |
| --- | --- |
| Key | Value |
| QuantumMetricSessionID | d41a0082a3f602519291829b57882901 |
| TAPID | abercrombie-hco/<br>main>018fa2be04b2000673ddbfefeefc05075011e06d0<br>09dc\| |
| QuantumMetricUserID | e632e170048f3ab09ee5cffbf0320ccc |

61.    The "TAPID" cookie is a cookie pertaining to Tealium, the advertising and tracking company discussed above.[18] According to Tealium documentation, the cookie was

---

[18] See https://docs.tealium.com/server-side/visitor-stitching/tapid/

CLASS ACTION COMPLAINT

"designed to facilitate cross-domain identification," meaning that it is designed to enable one to track the user across various websites.[19]

62.    The cookies beginning with "QuantumMetric" pertain to Quantum Metric, an online analytics company. Adobe has extensive documentation regarding how its services can be linked with those of Quantum Metric, specifically by using the QuantumMetricSessionID cookie:

6. Select the **Open Editor** button and paste in the following code:

```
// Check for the presence of the Quantum Metric session ID cookie
const qmCookie = _satellite.cookie.get("QuantumMetricSessionID");
if(qmCookie != null) return qmCookie;
// If a cookie is not set, check local storage
const qmLocalStorage = JSON.parse(localStorage.getItem("QM_S") || "{}");
if (qmLocalStorage?.s != null) return qmLocalStorage.s;
```

(https://experienceleague.adobe.com/en/docs/analytics-platform/using/cja-usecases/third-party/qm/tie-session-replays)

63.    Further, along with all of this data, the Adobe software code that Defendants cause to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Adobe:

user-agent                 Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7)
                           AppleWebKit/537.36 (KHTML, like Gecko) Chrome/
                           123.0.0.0 Safari/537.36

The "user-agent" corresponds to the device and browser that the user has used to access the Website.

64.    Finally, the data sent to Adobe includes the user's IP address.

---

[19] *See id.*

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.**     **The Private Communications Collected are Valuable.**

65.     As part of its regular course of business, Defendants target California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendants' and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendants cause to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendants knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

66.     The Private Communications that the Third Parties track and collect by way of the cookies on the Website are valuable to Defendants as well as the Third Parties. Defendants can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendants wanted to market certain of their casual clothing to consumers in California, Defendants could use the data collected by the Third Parties to monitor the location of users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendants to target online advertisements to users when they visit *other* websites, even those completely unrelated to Defendants and their products.

67.     Data about users' browsing history enables Defendantss to spot patterns in users' behavior on the Website and their interests in, among other things, Defendants' casual clothing products. On a broader scale, it enables Defendants to gain an understanding of trends happening across their brands and across the casual clothing market. All of this helps Defendants further monetize their Website and maximize revenue by collecting and analyzing user data.

68.     The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[20] Indeed, "[t]he monetary value

---

[20] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

CLASS ACTION COMPLAINT

of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

69.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

70.    Through its false representations and aiding, agreeing with, employing, permitting, or otherwise causing the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendants are unjustly enriching themselves at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

**PLAINTIFFS' EXPERIENCES**

**Plaintiff Frankle:**

71.    Plaintiff Frankle visited the Website to seek information about Hollister products, while located in California, on one or more occasions during the last four years.

72.    Plaintiffs' visits to the Website were consistent with a typical Website user's visits seeking information about Hollister products. Specifically, Plaintiff is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendants' privacy practices.

73.    When Plaintiff visited the Website, the Website immediately detected that he was a visitor in California and presented him with Defendants' popup cookie consent banner, which provided the option to "configure your preferences and see a list of third party tracking technologies, by clicking on the 'Confirm My Preferences' button." Plaintiff viewed Defendants' representation on the popup cookie consent banner that, "Tracking technologies, such as cookies, are important for the correct functioning of our website. By clicking 'accept' you are directing us to use optional third party tracking technologies."

CLASS ACTION COMPLAINT

74.     Plaintiff clicked the manage "Confirm My Preferences" button. The Website then displayed to Plaintiff the cookie consent preferences window. Defendants represented in the cookie consent preferences window that "Based on your state of residence, you may have the right to direct us not to 'sell' or 'share' (as defined under applicable law) your information to third parties for purposes of cross-context targeted advertising. ... To turn off cross-context targeted advertising, toggle Sale or Share of Personal Data to 'off' and click Confirm My Preferences."

75.     Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff toggled off "Share or Sale of Personal Data" in the cookie consent preferences window. Plaintiff believed that toggling off "Share or Sale of Personal Data" in the cookie consent preferences window found on the Website would allow him to opt out of, decline, and/or reject all non-essential cookies and other tracking technologies (inclusive of those cookies used for targeted advertising).

76.     In toggling off "Share or Sale of Personal Data" in the cookie consent preferences window, Plaintiff gave Defendants notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff specifically rejected, based on Defendants' representations, those cookies used for "cross-context targeted advertising" and those that share or sell personal information to third parties. In reliance on these representations and promises, only then did Plaintiff continue browsing the Website.

77.     Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for targeted advertising, to be placed on Plaintiffs' device and/or transmitted to the Third Parties along with user data, without Plaintiffs' knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff that she could configure the Website's use and/or placement of all non-essential/optional cookies and tracking technologies while she browsed the Website was false. Contrary to what Defendants made Plaintiff believe, he did not have a choice about whether

third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendants had already caused that to happen.

78.    Then, as Plaintiff continued to browse the Website in reliance on the promises Defendants made in the cookie consent banner and cookie consent preferences window, and despite Plaintiff's clear rejection of the use and/or placement of such non-essential cookies and tracking technologies (including those used for targeted advertising), Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing targeted advertising from the Third Parties on his device. In doing so, Defendants permitted the Third Parties to track and collect Plaintiff's Private Communications as Plaintiff browsed the Website.

79.    Defendants' representations that consumers could "configure your preferences" to reject optional cookies and/or "to turn off cross-context targeted advertising" while Plaintiff and users browsed the Website were untrue. Had Plaintiff known this fact, he would not have used the Website. Moreover, Plaintiff reviewed the popup cookie consent banner and cookie consent preferences window prior to using the Website. Had they disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after Plaintiff chose to turn off all non-essential cookies (including those used for targeted advertising), Plaintiff would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

80.    Plaintiff continues to desire to browse content featured on the Website. Plaintiff would like to browse websites that do not misrepresent that users can reject all non-essential cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all non-essential cookies and tracking technologies, Plaintiff would likely browse the Website again in the future, but will not do so until then. Plaintiff regularly visits websites that feature content similar to that of the Website. Because Plaintiff does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all non-

essential cookies and tracking technologies, Plaintiff will be unable to rely on Defendants' representations when browsing the Website in the future absent an injunction that prohibits Defendants from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Salinas:**

81.    Plaintiff Salina visited the Website to seek information about Hollister products, while located in California, on one or more occasions during the last four years.

82.    Plaintiffs' visits to the Website were consistent with a typical Website user's visits seeking information about Hollister products. Specifically, Plaintiff is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendants' privacy practices.

83.    When Plaintiff visited the Website, the Website immediately detected that she was a visitor in California and presented her with Defendants' popup cookie consent banner, which provided the option to "configure your preferences and see a list of third party tracking technologies, by clicking on the 'Confirm My Preferences' button." Plaintiff viewed Defendants' representation on the popup cookie consent banner that, "Tracking technologies, such as cookies, are important for the correct functioning of our website. By clicking 'accept' you are directing us to use optional third party tracking technologies."

84.    Plaintiff clicked the manage "Confirm My Preferences" button. The Website then displayed to Plaintiff the cookie consent preferences window. Defendants represented in the cookie consent preferences window that "Based on your state of residence, you may have the right to direct us not to 'sell' or 'share' (as defined under applicable law) your information to third parties for purposes of cross-context targeted advertising. ... To turn off cross-context

targeted advertising, toggle Sale or Share of Personal Data to 'off' and click Confirm My Preferences."

85.     Consistent with her typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff toggled off "Share or Sale of Personal Data" in the cookie consent preferences window. Plaintiff believed that toggling off "Share or Sale of Personal Data" in the cookie consent preferences window found on the Website would allow her to opt out of, decline, and/or reject all non-essential cookies and other tracking technologies (inclusive of those cookies used for targeted advertising).

86.     In toggling off "Share or Sale of Personal Data" in the cookie consent preferences window, Plaintiff gave Defendants notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff specifically rejected, based on Defendants' representations, those cookies used for "cross-context targeted advertising" and those that share or sell personal information to third parties. In reliance on these representations and promises, only then did Plaintiff continue browsing the Website.

87.     Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for targeted advertising, to be placed on Plaintiffs' device and/or transmitted to the Third Parties along with user data, without Plaintiff's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff that she could configure the Website's use and/or placement of all non-essential/optional cookies and tracking technologies while she browsed the Website was false. Contrary to what Defendants made Plaintiff believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendants had already caused that to happen.

88.     Then, as Plaintiff continued to browse the Website in reliance on the promises Defendants made in the cookie consent banner and cookie consent preferences window, and despite Plaintiffs' clear rejection of the use and/or placement of such non-essential cookies and tracking technologies (including those used for targeted advertising), Defendants nonetheless

continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing targeted advertising from the Third Parties on her device. In doing so, Defendants permitted the Third Parties to track and collect Plaintiff's Private Communications as Plaintiff browsed the Website.

89.     Defendants' representations that consumers could "configure your preferences" to reject optional cookies and/or "to turn off cross-context targeted advertising" while Plaintiff and users browsed the Website were untrue. Had Plaintiff known this fact, she would not have used the Website. Moreover, Plaintiff reviewed the popup cookie consent banner and cookie consent preferences window prior to using the Website. Had they disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after Plaintiff chose to turn off all non-essential cookies (including those used for targeted advertising), Plaintiff would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

90.     Plaintiff continues to desire to browse content featured on the Website. Plaintiff would like to browse websites that do not misrepresent that users can reject all non-essential cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all non-essential cookies and tracking technologies, Plaintiff would likely browse the Website again in the future, but will not do so until then. Plaintiff regularly visits websites that feature content similar to that of the Website. Because Plaintiff does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all non-essential cookies and tracking technologies, Plaintiff will be unable to rely on Defendants' representations when browsing the Website in the future absent an injunction that prohibits Defendants from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data

underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff is not a software developer and has not received training with respect to HTTP network calls.

## **CLASS ALLEGATIONS**

89.     Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

**Class**: All persons who browsed the Website in the State of California after rejecting all non-essential cookies in the cookie consent preferences window from August 29, 2021 to present (the "Class").

90.     This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

91.     **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

92.     **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendants would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject all non-essential cookies and tracking technologies on the Website, nor would Defendants permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

93.     The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.      Whether Defendants' actions violate California laws invoked herein; and

b.      Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

94.     **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs', like the other Class members, visited the Website, rejected non-essential cookies, and had her confidential Private Communications intercepted by the Third Parties.

95.     **Adequacy of Representation:** Plaintiffs' will fairly and adequately protect the interests of all Class members because it is in her best interests to prosecute the claims alleged herein to obtain full compensation due to her for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent her interests and those of the Class. By prevailing on their claims, Plaintiffs' will establish Defendants' liability to all Class members. Plaintiffs' and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs' and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

96.     **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class members' rights and the disposition of their interests through actions to

which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

97.    Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

98.    To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendants constituting a serious invasion of privacy.

99.    Defendants have intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

100.    Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendants affirmatively promised users they could reject all non-essential and tracking technologies (including those used for targeted advertising and those that share or sell personal information) before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the

popup cookies consent banner on the Website, Plaintiffs and Class members rejected non-essential cookies and reasonably expected that her and their rejection of non-essential cookies and tracking technologies would be honored. That is, they reasonably believed that Defendants would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they rejected such cookies and/or tracking technologies, Defendants would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

101.    Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

102.    Defendants, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permit the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. The data that Defendants allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by

allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

103.    Defendants' actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

104.    Defendants' intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

105.    Defendants lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

106.    Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

107.    Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of its intrusions upon Plaintiffs' and Class members' privacy.

108.    Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of non-essential cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**Second Cause of Action**: Intrusion Upon Seclusion

109. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

110. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendants intentionally intruded into a place, conversation, or matter as to which Plaintiffs have a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

111. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendants' representations otherwise in the popup cookie consent banner, Defendants intentionally intruded upon the solitude or seclusion of Website users. Defendants effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

112. The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Website using third-party cookies that Defendants caused to be stored on users' devices—and to be transmitted to Third Parties—were not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to toggle off "Share or Sale of Personal Data" in the cookie consent preferences window.

113. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding her and their Private Communications on the Website based on Defendants' promise that users could toggle off "Share or Sale of Personal Data" in the cookie consent preferences window, as well as state criminal and civil laws designed to protect individual privacy.

114. Defendants' intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendants represented that Website users could reject non-essential cookies when, in fact, Defendants

caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendants' false representations, that when they rejected all non-essential cookies and tracking technologies, Defendants would not cause such third-party cookies to be stored on her and their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

115.    Defendants' conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

116.    Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

117.    Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of its intrusions upon Plaintiffs' and Class members' privacy.

118.    Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of non-essential cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**Third Cause of Action**: **Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

119.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

120.    California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to

- 46 -

learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

121.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

122.    Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

123.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendants, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

[i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

[ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

[iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

CLASS ACTION COMPLAINT

Cal. Penal Code § 631(a).

124.    CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

125.    Each Defendant is a "person" within the meaning of California Penal Code § 631.

126.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

127.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties— constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendants' deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

128.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendants, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

129.    Under § 631(a), Defendants must show they had the consent of all parties to a communication.

130.    At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendants willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

131.    At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

132.    The Private Communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

133.    At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

CLASS ACTION COMPLAINT

134.    Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendants aiding, agreeing with, employing, permitting, or otherwise causing the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to reject non-essential cookies in the cookie consent preferences window.

135.    The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendants—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

136.    Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of her and their right to privacy, (ii) loss of value in her and their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

137.    Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendants' violations of CIPA § 631(a), as well as injunctive relief.

138.    Unless enjoined, Defendants will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants.  Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to casual clothing products. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if her and their request to reject non-essential cookies and tracking technologies will be honored and/or whether Defendants will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants. Further, Defendants have already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants and will continue to do so unless and until enjoined.

**Fourth Cause of Action:** Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)

139.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

140.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

141.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

142.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire

1  or electronic communication is transmitted, but not the contents of a communication." Cal.

2  Penal Code § 638.50(b).

3  143.  The Third Parties' cookies and the corresponding software code installed by

4  Defendants on their Website are each "pen registers" because they are "device[s] or process[es]"

5  that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address

6  and user-agent information—from the electronic communications transmitted by Plaintiffs' and

7  the Class's computers or devices. Cal. Penal Code § 638.50(b).

8  144.  At all relevant times, Defendants caused the Third Parties' cookies and the

9  corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class

10  members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members'

11  IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16

12  (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D.

13  Cal. Oct. 21, 2024).

14  145.  Some of the information collected by the Third Parties' cookies and the

15  corresponding software, including IP addresses and user-agent information, does not constitute

16  the content of Plaintiffs' and the Class members' electronic communications with the Website.

17  *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute

18  addressing information and do not necessarily reveal any more about the underlying contents

19  of communication…") (cleaned up).

20  146.  Plaintiffs and Class members did not provide their prior consent to Defendants'

21  use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the

22  Class members informed Defendants that they did not consent to the Website's use of third-

23  party cookies by toggling off "Share or Sale of Personal Data" in the cookie consent preferences

24  window.

25  147.  Defendants did not obtain a court order to install or use the third-party cookies

26  and corresponding software to track and collect information about Plaintiffs' and Class

27  member's communications, including IP addresses and user-agent information.

28

CLASS ACTION COMPLAINT

148.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

149.     Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendants' violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

150.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

151.     Defendants fraudulently and deceptively informed Plaintiffs and Class members that they could reject non-essential cookies (including those used for targeted advertising and those that share or sell personal information).

152.     However, despite Defendants' representations otherwise, Defendants caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users toggled off "Share or Sale of Personal Data" in the cookie consent preferences window. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to reject non-essential cookies.

153.     These misrepresentations and omissions were known exclusively to, and actively concealed by Defendants, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendants knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to reject non-essential cookies by toggling off "Share or Sale of Personal Data" in the cookie consent preferences window, which Defendants promised its users they could do. Defendants' misrepresentations and omissions

concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing her and them, Defendants breached their duty to Plaintiffs and Class members. Defendants also gained financially from, and as a result of, their breach.

154.    Plaintiffs and Class members relied to their detriment on Defendants' misrepresentations and fraudulent omissions.

155.    Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendants' unfair, deceptive, and/or unlawful practices, including the unauthorized interception of her and their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of her and their private and personally identifiable information and communications.

156.    Defendants' actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

157.    Defendants' representations that Website users could "configure your [cookie] preferences" and turn off cookies used for "cross-context targeted advertising" if they "toggle Sale or Share of Personal Data to 'off' and click Confirm My Preferences" were untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and cookie consent preferences window prior to their interactions with the Website. Had Defendants disclosed that they caused third-party non-essential cookies to be stored on Website visitors' devices that are related to targeted advertising and/or share or sell personal information with

CLASS ACTION COMPLAINT

third parties even after they choose to reject all such non-essential cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

158.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendants would not permit third parties to obtain users' Private Communications when consumers chose to reject non-essential cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

159.    Plaintiffs and Class members justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants' conduct.

160.    As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

161.    Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of non-essential cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

### Sixth Cause of Action: Unjust Enrichment

162.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

163.    Defendants created and implemented a scheme to increase their own profits through a pervasive pattern of false statements and fraudulent omissions.

164.    Defendants were unjustly enriched as a result of their wrongful conduct, including through their misrepresentation that users could toggle off cookies used for targeted advertising and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users'

Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected such cookies.

165.     Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendants.

166.     Defendants have been unjustly enriched at the expense of Plaintiffs and Class members, and Defendants have unjustly retained the benefits of their unlawful and wrongful conduct.

167.     Defendants appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendants at her and their detriment. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of Plaintiffs and Class members.

168.     It would be unjust for Defendants to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

169.     There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

170.     Plaintiffs and Class members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

171.     Plaintiffs plead this claim separately, as well as in the alternative, to her other claims, as without such claims Plaintiffs would have no adequate legal remedy.

### **Seventh Cause of Action: Trespass to Chattels**

172.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

173.    Defendants, intentionally and without consent or other legal justification, caused cookies to be stored on Plaintiffs' and Class members' browsers and devices, which caused the Third Parties and Defendants to track and collect Plaintiffs' and Class members' Private Communications and use the data collected for their own advantage, as described above.

174.    Defendants were unjustly enriched as a result of their wrongful conduct, including through its misrepresentation that users could reject all non-essential cookies and tracking technologies, and through their failure to disclose that Defendants cause third-party cookies to be stored on consumers' devices and browsers, which cause the Third Parties and Defendants to track and collect Plaintiffs' and Class members' Private Communications even after consumers chose to reject such cookies.

175.    Defendants intentionally caused third party software code to be stored onto Plaintiffs' and Class members' devices, knowing that the code would be executed by those devices. The software code then placed and/or transmitted cookies along with Plaintiffs' and Class members' Private Communications to the Third Parties. These intentional acts interfered with Plaintiffs' and Class members' use of the following personal property owned, leased, or controlled by Plaintiffs and other users: (a) her and their computers and other electronic devices; and (b) her and their personally identifiable information.

176.    Defendants' trespass of Plaintiffs' and other users' computing devices resulted in harm to Plaintiffs and other users and caused Plaintiffs and other users the following damages:

        a.    Nominal damages for trespass;

        b.    Reduction of storage, disk space, and performance of Plaintiffs' and other users' computing devices; and

        c.    Loss of value of Plaintiffs' and other users' computing devices.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against each Defendant as follows:

A.     Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.     An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against each Defendant for all damages sustained as a result of each Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.     An award of punitive damages;

D.     An award of nominal damages;

E.     An order for full restitution;

F.     An order requiring each Defendant to disgorge revenues and profits wrongfully obtained;

G.     An order temporarily and permanently enjoining each Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.     For reasonable attorneys' fees and the costs of suit incurred; and

I.     For such further relief as may be just and proper.

Dated: August 29, 2025

GUTRIDE SAFIER LLP

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT