JASON D. RUSSELL (SBN 169219)
Jason.Russell@skadden.com
HILLARY A. HAMILTON (SBN 218233)
Hillary.Hamilton@skadden.com
SKADDEN, ARPS,
SLATE, MEAGHER & FLOM LLP
2000 Avenue of the Stars, Suite 200N
Los Angeles, California 90067
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

JAMES Y. PAK (SBN 304563)
James.Pak@skadden.com
SKADDEN, ARPS,
SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone:(650) 470-4500
Facsimile: (650) 470-4570

OF COUNSEL:
MICHAEL W. MCTIGUE JR.
Michael.McTigue@skadden.com
MEREDITH C. SLAWE
Meredith.Slawe@skadden.com
SKADDEN, ARPS,
SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Defendants,*
*Hollister Co. and Abercrombie & Fitch Co.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

DAVID FRANKLE and MARIA SALINAS, individuals, on behalf of themselves, the general public, and those similarly situated,

Plaintiffs,

vs.

HOLLISTER CO., and ABERCROMBIE & FITCH CO.,

Defendants.

Case No. 3:25-cv-07338-MMC

**DEFENDANTS HOLLISTER CO. AND ABERCROMBIE AND FITCH CO.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY ACTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

**<u>FILED UNDER SEPARATE COVER</u>:**

**(1) DECLARATION OF CHRISTINA MONACO IN SUPPORT;**

**(2) DECLARATION OF JAMES Y. PAK IN SUPPORT;**

**(3) REQUEST FOR JUDICIAL NOTICE; and**

**(4) [PROPOSED] ORDERS.**

Hearing Date: January 23, 2026
Hearing Time: 9:00 a.m.
Judge: Hon. Maxine M. Chesney
Complaint filed: August 29, 2025

# NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on January 23, 2026, at 9:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Maxine M. Chesney, United States District Judge, Northern District of California, located at the San Francisco Courthouse, 450 Golden Gate Avenue, Courtroom 7, 19th Floor, San Francisco, California 94102, Defendants Hollister Co. ("Hollister") and Abercrombie & Fitch Co. ("A&F," and together, "Defendants") will, and hereby do, move for an order compelling individual arbitration of Plaintiffs' claims pursuant to the Federal Arbitration Act, 9 U.S.C § 1 *et seq*. and staying this action pending the outcome of any arbitration proceedings.

This motion is based upon the mutual arbitration provision in the Hollister Website Terms of Use, to which Plaintiffs agreed, which specifies that this action must be resolved via "binding individual arbitration." At least one Plaintiff also agreed to the same provision in agreeing to the Hollister House Rewards Terms and Sale Terms. This motion is further based upon this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the Request for Judicial Notice, the Declaration of Christina Monaco, dated October 23, 2025 ("Monaco Decl."), the Declaration of James Pak, dated October 24, 2025 ("Pak Decl."), the [Proposed] Orders, any oral argument heard by the Court, and such other matters as the Court may consider.

DATED: October 24, 2025

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ *Jason D. Russell*
Jason D. Russell

*Attorneys for Defendants,*
*Hollister Co. and Abercrombie & Fitch Co.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .......... 1

BACKGROUND .......... 3

I. Plaintiffs' Complaint .......... 3

II. The Arbitration Provision .......... 3

ISSUES TO BE DECIDED .......... 9

LEGAL STANDARD .......... 9

ARGUMENT .......... 11

I. PLAINTIFFS ARE BOUND BY THE ARBITRATION PROVISION .......... 11

A. Plaintiff Salinas Agreed to the Arbitration Provision While Signing Up For the Hollister House Rewards Program .......... 11

B. Plaintiff Salinas Agreed to the Arbitration Provision While Making Online Purchases .......... 13

C. Both Plaintiffs Are Bound By The Website Terms .......... 14

II. PLAINTIFFS' CLAIMS ARE GOVERNED BY THE ARBITRATION AGREEMENT .......... 17

III. THIS ACTION SHOULD BE STAYED PENDING ARBITRATION .......... 18

CONCLUSION .......... 18

# TABLE OF AUTHORITIES

Page(s)

## CASES

*84 Lumber Co., LP v. Thompson Thrift Construction, Inc.*,
No. 2:15-cv-1052,
2018 WL 1393893 (S.D. Ohio Mar. 20, 2018) ... 15

*Allied-Bruce Terminix Cos. v. Dobson*,
513 U.S. 265 (1995) ... 9

*Allen v. Shutterfly, Inc.*,
No. 20-cv-02448-BLF,
2020 WL 5517172 (N.D. Cal. Sept. 14, 2020) ... 15

*Austin v. Lyft, Inc.*,
No. 21-cv-09345-MMC,
2022 WL 4095386 (N.D. Cal. Sept. 2, 2022) ... 9

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ... 9

*AT&T Technologies, Inc. v. Communications Workers of America*,
475 U.S. 643 (1986) ... 17

*Babaeva v. J. Crew Group, LLC*,
No. 23-cv-01695-JSW,
2023 WL 7346079 (N.D. Cal. Nov. 6, 2023) ... 13

*Barnabas Clothing, Inc. v. Kabbage, Inc.*,
No. CV 18-3414 PSG (SSx),
2018 WL 9669565 (C.D. Cal. June 8, 2018) ... 17

*Bender v. Twilio Inc.*,
No. 24-cv-04914-AMO,
2025 WL 2308484 (N.D. Cal. Aug. 11, 2025) ... 14, 15

*Citizens Bank v. Alafabco, Inc.*,
539 U.S. 52 (2003) ... 10

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) ... 9

*Doe v. Eating Recovery Ctr. LLC*,
No. 23-CV-05561-VC,
2025 WL 2971090 (N.D. Cal. Oct. 17, 2025) ... 3

*DuFour v. Allen*,
No. 14-cv-05616-CAS(SSx),
2017 WL 1433303 (C.D. Cal. Apr. 20, 2017) ........ 15

*Duval v. Costco Wholesale Corp.*,
No. 22-cv-02338-TSH,
2023 WL 3852694 (N.D. Cal. June 5, 2023) ........ 10

*Gilmer v. Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991) ........ 9

*Guerrero v. Equifax Credit Info. Services, Inc.*,
No. CV 11–6555 PSG (PLAx),
2012 WL 7683512 (C.D. Cal. Feb. 24, 2012) ........ 17

*Gulf Oil Corp. v. Copp Paving Co.*,
419 U.S. 186 (1974) ........ 10

*Houtchens v. Google LLC*,
649 F. Supp. 3d 933 (N.D. Cal. 2023) ........ 11, 12, 14

*Keebaugh v. Warner Bros. Entertainment Inc.*,
100 F.4th 1005 (9th Cir. 2024) ........ 13

*KWB and Associates, Inc. v. Marvin*,
No. ED CV 18-289-DMG (KKx),
2018 WL 5094927 (C.D. Cal. Apr. 18, 2018) ........ 1

*L.B. v. LinkedIn Corp.*,
No. 5:24-cv-06832-EJD,
2025 WL 2899514 (N.D.Cal. Oct. 10, 2025) ........ 12, 15

*Lamps Plus, Inc. v. Varela*,
587 U.S. 176 (2019) ........ 17

*Language Line Services, Inc. v. Language Services Associates, LLC*,
No. C 10-02605 JW,
2011 WL 13153247 (N.D. Cal. Mar. 17, 2011) ........ 15

*Lemberg v. San Francisco Opera Ass'n*,
No. 17-cv-06641-MMC,
2018 WL 11265549 (N.D. Cal. Jan. 19, 2018) ........ 17

*Mac Tools v. Diaz*,
No. 2:11–cv–940,
2012 WL 1409395 (S.D. Ohio Apr. 23, 2012) ........ 15

*Martinez v. Leslie's Poolmart, Inc.*,
No. 8:14–cv–01481–CAS (CWx),
2014 WL 5604974 (C.D. Cal. Nov. 3, 2014) ........ 10

*McLellan v. Fitbit, Inc.*,
No. 3:16-cv-00036-JD,
2018 WL 1913832, (N.D. Cal. Jan. 24, 2018) ........ 11

*Morrison v. Yippee Ent., Inc.*,
No. 22-cv-09123-JSW,
2025 WL 2389424 (9th Cir. Aug. 18, 2025) ........ 12

*Moyer v. Chegg, Inc.*,
No. 22-cv-09123-JSW,
2023 WL 4771181 (N.D. Cal. July 25, 2023) ........ 13

*Mullen v. Chaac Pizza Midwest, LLC*,
No. 1:20-cv-893,
2022 WL 673187 (S.D. Ohio Mar. 7, 2022) ........ 11

*Needleman v. Golden 1 Credit Union*,
474 F. Supp. 3d 1097 (N.D. Cal. 2020) ........ 16

*Oberstein v. Live Nation Entertainment, Inc.*,
60 F.4th 505 (9th Cir. 2023) ........ 9, 11, 12

*Pearl v. Coinbase Glob., Inc.*,
No. 22-cv-03561-MMC,
2023 WL 1769190 (N.D. Cal. Feb. 3, 2023) ........ 9

*Perez v. Bath & Body Works, LLC*,
No. 21-cv-05606-BLF,
2022 WL 2357004 (N.D. Cal. June 30, 2022) ........ 4, 10, 11

*Pizarro v. QuinStreet, Inc.*,
No. 22-cv-02803-MMC,
2022 WL 3357838 (N.D. Cal. Aug. 15, 2022) ........ 13, 15

*Ponomarenko v. Shapiro*,
287 F. Supp. 3d 816 (N.D. Cal. 2018) ........ 15

*Rudolph v. Wright Patt Credit Union*,
175 N.E.3d 636 (Ohio Ct. App. 2021) ........ 16

*Shepard v. Edward Mackay Enters., Inc.*,
148 Cal. App. 4th 1092 (2007) ........ 10

*Smith v. Spizzirri*,
601 U.S. 472 (2024) ........ 17, 18

*Swift v. Zynga Game Network, Inc.*,
805 F. Supp. 2d 904 (N.D. Cal. 2011) ........ 13

*Trout v. Comcast Cable Communications, LLC*,
No. 17-cv-01912-RS,
2018 WL 4638705 (N.D. Cal. Mar. 15, 2018) ..... 17

*In re Verisign, Inc., Derivative Litig.*,
531 F. Supp. 2d 1173, 1224 (N.D. Cal. 2007) ..... 10

## STATUTES

9 U.S.C. § 1 ..... 9

9 U.S.C. § 2 ..... 9

9 U.S.C. § 3 ..... 17

Cal. Civ. Code § 1642 ..... 15

Cal. Civ. Code §3521 ..... 15

## PRELIMINARY STATEMENT

Plaintiffs should be compelled to arbitrate their privacy and common law fraud-related claims on an individual basis because they agreed to arbitrate those claims. This Court need not reach this issue, however. As shown in the Motion to Transfer Class Action Complaint ("Motion to Transfer") concurrently filed by Defendants Hollister Co. and Abercrombie & Fitch Co. (together, "Defendants"), this action should be transferred to the U.S. District Court for the Southern District of Ohio. Plaintiffs agreed to and are bound by a forum-selection clause, and alternatively, the interests of justice and the convenience of the parties and witnesses warrant transfer, particularly since venue in this District is improper as to Plaintiff Salinas. (*See generally* Motion to Transfer.) This Court can and should decide the Motion to Transfer first, because the Southern District of Ohio is the appropriate forum to determine whether Plaintiffs' claims are subject to arbitration according to the parties' agreement, and also as the only forum with jurisdiction over both Plaintiffs' claims. (*See id*. Argument §§ I, II.A.) Nevertheless, if the Court declines to transfer the action, it should compel arbitration of Plaintiffs' claims as shown below.[1]

*First*, Plaintiffs are bound by the mandatory arbitration provision ("Arbitration Provision") present in the Hollister "Website Terms of Use" ("Website Terms"), which states that "[a]ny Dispute" between Plaintiffs and Hollister "will be resolved through binding individual arbitration" that "shall be heard and determined by a single arbitrator and [] administered by the American Arbitration Association ('AAA')." (Monaco Decl. Ex. C at 10.)[2] The same provision appears in the Sale Terms, and Hollister House Rewards Terms and Conditions ("Rewards Terms"), to which at least one Plaintiff repeatedly and affirmatively agreed. (Monaco Decl. Ex. B at 11-12, Ex. E at 12.) Because Plaintiffs agreed to the Arbitration Provision, Plaintiffs must submit their claims to arbitration.

*Second*, the Arbitration Provision applies to any "Dispute" between Plaintiffs and Hollister, which

---

[1] Defendants' Motion to Compel Arbitration is filed in lieu of an answer or other response to the Complaint. Defendants do not waive and expressly reserve all other defenses that may be available at a later stage of this action, such as its defenses under Federal Rule of Civil Procedure 12(b)(6). *See KWB and Assocs., Inc. v. Marvin*, 2018 WL 5094927, at *9 (C.D. Cal. Apr. 18, 2018) ("Courts in this Circuit… commonly treat motions to compel arbitration as preliminary motions under Federal Rule of Civil Procedure 12.").

[2] Unless otherwise noted, all emphases are added and all citations, footnotes, original alterations, and internal quotation marks are omitted from all quoted material for ease of reading. References to "Pak Decl." and "Monaco Decl." are to the concurrently-filed declarations of James Y. Pak and Christina Monaco, respectively.

should be "given the broadest possible meaning permitted by law" to include "***any claim or controversy between [Plaintiffs] and [Hollister]***." (*Id.* Ex. B at 10, Ex. E at 10.) Plaintiffs' claims are plainly encompassed by this language. Plaintiffs' claims are also premised on their use of the Website, and the Website Terms contain the same Arbitration Provision found in the Sale Terms and Reward Terms. (*Compare id.* Ex. C at 10-12 *with* Ex. B at 11-12, Ex. E at 12.) Plaintiffs must resolve these disputes in individual arbitration before the AAA.

Plaintiffs' Counsel is well aware that Plaintiffs' claims belong in arbitration. Indeed, Plaintiffs' Counsel recently brought near-identical claims on behalf of a different client against Dollar Tree Stores, Inc. in arbitration, pursuant to an arbitration provision applying to "all disputes, controversies, or claims arising under, out of, or relating to these Terms." (*See* Pak Decl. Ex. 1 at Attachment 4(b) §16; *Id.* Attachment 8(c) at Interim Award p. 2.)[3] Notably, the arbitrator dismissed that case with prejudice, holding that "there is no factual basis for the Claimant's allegations that she visited the Dollar Tree website and rejected advertising cookies from the cookie consent banner, but nevertheless received advertising cookies on her web browser." (Pak Decl. Ex. 1, Attachment 8(c) at Interim Award p. 4.) The arbitrator further awarded attorney's fees and costs, stating: "the actions on record in these proceedings and in the broader context are tantamount to harassment and are patently frivolous." (*Id.*, Attachment 8(c) at Interim Award p. 6; Final Award at 1, 3 (Interim Award is "confirmed, adopted and incorporated as if fully set forth herein").) Plaintiffs' Counsel is thus cognizant that the Arbitration Provision governs Plaintiffs' claims here, but seeks to avoid its application.

*Third*, Defendants respectfully request that if the Court compels Plaintiffs to arbitrate their claims on an individual basis before the AAA, that the Court stay this action pending the outcome of any arbitrations pursuant to 9 U.S.C. § 3.

[3] This is not isolated. On information and belief, Plaintiffs' counsel has threatened more than 100 businesses with potential "mass arbitrations" in an effort to extract windfall settlements.

## BACKGROUND

### I. Plaintiffs' Complaint

As explained in the concurrently-filed Motion to Transfer, Plaintiffs vaguely allege that they visited the Hollister website at www.hollisterco.com (the "Website") on "one or more" unspecified "occasions" to "seek information about Hollister products." (Compl. ¶¶71, 81.)

On August 29, 2025, Plaintiffs filed this lawsuit on behalf of "[a]ll persons who browsed" the Website "in the State of California after rejecting all non-essential cookies in the cookie consent preferences window from August 29, 2021 to present." (*Id.* ¶89.) Plaintiffs assert claims for invasion of privacy, intrusion upon seclusion, common law fraud, deceit, and/or misrepresentation, unjust enrichment, trespass to chattels, and violations of the California Invasion of Privacy Act ("CIPA").[4]

Plaintiffs allege that they, and other consumers, were presented with a popup cookie consent banner stating that "Tracking technologies, such as cookies are important for the correct functioning" of the Website, and that Plaintiffs selected the "Confirm My Preferences" button and toggled off the "Share or Sale of Personal Data" in the preferences window. (*Id.* ¶¶ 27-28, 74-75, 84-85.) Plaintiffs claim the banner "led [them]… to believe that Defendants would not allow third parties, through cookies, to access their Private Communications with the Website," but Defendants instead "caused… Third Party tracking cookies to be placed" on their devices. (*Id.* ¶¶30-31.) Plaintiffs claim that if they knew these purported facts, they "would not have used the Website." (*Id.* ¶¶79, 89.)

In short, Plaintiffs' allegations are focused on alleged advertising and tracking cookies, and purported representations allegedly made regarding those cookies on the Website.

### II. The Arbitration Provision

The Arbitration Provision appears in at least three different locations on the Website.

Website Terms. The Website Terms are underlined and hyperlinked at the bottom of every page of

---

[4] Plaintiffs' Counsel has filed numerous complaints against retailers urging the same claims, but "there is reason to question whether the Legislature intended for CIPA to apply to the type of conduct implicated by this case at all." *Doe v. Eating Recovery Ctr. LLC*, No. 23-CV-05561-VC, 2025 WL 2971090, at *6 (N.D. Cal. Oct. 17, 2025). Indeed, CIPA is "virtually impossible to apply [] to the online world" and should not be read "broadly: it is a criminal statute." *Id.* at *7. Plaintiffs' other claims are equally meritless.

the Website. (Monaco Decl. ¶22.)[5] The Website Terms state immediately and in a separate paragraph that they expressly "apply to all visitors to, or users of, this Website[]." (*Id.* Ex. C at 1.) The Website Terms also prominently state, in bold font and at the very top of the Terms themselves, that the Terms "contain a mandatory dispute resolution provision that includes a binding arbitration provision, class action waiver, and jury trial waiver." (*Id.*) Specifically, the Website Terms state the following in large, bold typeface:

> **These Terms of Use contain a mandatory dispute resolution provision that includes a binding arbitration provision, class action waiver, and jury trial waiver that affect your rights. The arbitration provision requires that disputes be resolved in individual arbitration or small claims court proceedings. In arbitration, there is no judge or jury and there is less discovery and appellate review than in court. Please review carefully.**

(*Id.*) The Website Terms also contain an introductory caution to all users, beneath a large and bolded "**Your Use Generally**" heading. (*Id.*) That warning informs users in a single, set-apart paragraph, that their use of the Website "confirms your acceptance of these Terms and Conditions and your agreement to be bound by them," and that if they do not accept these Terms, they are asked not to use the Website. (*Id.*) The Website Terms state in relevant part the following:

> Your use of the Website/App confirms your acceptance of these Terms and Conditions and your agreement to be bound by them. If you do not accept these Terms and Conditions, do not use this Website/App.… We may at any time and from time to time revise these Terms and Conditions by updating this posting. You should visit this page from time to time to review these Terms and Conditions to learn of and understand any changes, because they are binding on you. Your use of this Website/App following any such revisions constitutes your agreement to follow and be bound by the terms as revised.

(*Id.*) The mandatory dispute resolution section ("Dispute Resolution Section") that Defendants flag in bold at the outset of the Website Terms is set apart by a heading in large, bolded typeface, with a bolded note beneath instructing users to "read this section carefully" because "it may significantly affect your legal rights," stating in relevant part:

> **Dispute Resolution (including informal dispute resolution process; arbitration provision; class action waiver; jury trial waiver; governing law and forum)**
>
> **Please read this section carefully - it may significantly affect your legal rights. It contains procedures for mandatory pre-dispute resolution, binding arbitration, a class action waiver, a jury trial waiver, and a provision on governing law and forum.**

[5] Courts regularly consider similar declarations when deciding motions to compel arbitration. *See, e.g.*, *Perez v. Bath & Body Works, LLC*, 2022 WL 2357004, at *3 (N.D. Cal. June 30, 2022) (considering "sworn declaration" that "includes images of [website's] sign-up flow… and states that Brooks signed up for the Program through that sign-up flow"). This Court may take judicial notice of the Website terms and other exhibits to the Monaco Declaration for the reasons stated in Defendants' concurrently-filed Request for Judicial Notice.

(*Id.* at 8.) The Dispute Resolution Section then lays out the dispute resolution process in detail, defining "Dispute" with the "broadest possible meaning permitted by law," to include "any claim or controversy between you and [Hollister]" and explains that an arbitrator "shall decide all issues **except**… issues that relate to the scope, validity, and enforceability of the arbitration provision, class action waiver, or any of the provisions of this Dispute Resolution [S]ection," which are reserved "for a court of competent jurisdiction to decide." (*Id.* (emphasis in original).)

> "Dispute" will be given the broadest possible meaning permitted by law. "Dispute" means any claim or controversy between you and [Hollister], including but not limited to: (1) any dispute or claim that arose before the existence of this or any prior Agreement (including, but not limited to, claims relating to advertising); (2) any dispute or claim that is currently the subject of purported class action litigation in which you are not a member of a certified class; and (3) any dispute or claim that may arise after the cancelation or expiration of this Agreement. The arbitrator shall decide all issues **except** the following (which are for a court of competent jurisdiction to decide): (1) issues that are reserved for a court in this Agreement; (2) issues that relate to the scope, validity, and enforceability of the arbitration provision, class action waiver, or any of the provisions of this Dispute Resolution section; and (3) issues that relate to the arbitrability of any Dispute.… You and [Hollister] agree that this Agreement evidences a transaction in interstate commerce and that this arbitration provision will be interpreted and enforced in accordance with the Federal Arbitration Act and federal arbitration law.

(*Id.* at 8-9) (emphasis in original). The Dispute Resolution Section in the Website Terms also includes an informal dispute resolution process that must be completed as "a condition precedent to commencing any formal Dispute resolution proceeding." (*Id.* at 9) The claimant must provide a written notice with basic contact information and the "nature and basis of the Dispute and the relief sought, including a calculation for it," and then the parties have 60 days to "negotiate in good faith in an effort to informally resolve the Dispute" before an arbitration or other legal proceeding can commence. (*Id.* at 9-10.)

The Dispute Resolution Section in the Website Terms contains a "Mutual Arbitration Provision" stating that "[a]ny Dispute between you and [Hollister]" not resolved through the informal dispute resolution process "will be resolved through binding individual arbitration," including a "Procedures for Arbitration" section stating that the "[a]rbitrations shall be heard and determined by a single arbitrator and be administered by the American Arbitration Association ('AAA') pursuant to its Consumer Arbitration Rules." (*Id.* at 10.)

> Mutual Arbitration Provision.
>
> Any Dispute between you and [Hollister] that is not resolved as set forth above will be resolved through binding individual arbitration, except that either of us may take a Dispute to small claims

> court so long as it isn't removed or appealed to a court of general jurisdiction. In arbitration, there is no judge or jury and there is less discovery and appellate review than in court.
>
> Procedures for Arbitration.
>
> Arbitrations shall be heard and determined by a single arbitrator and be administered by the American Arbitration Association ("AAA") pursuant to its Consumer Arbitration Rules (collectively the "AAA Rules") as modified by the version of this arbitration provision that is in effect when notice of a Dispute is given. The AAA Rules can be obtained from the AAA by visiting its website (www.adr.org) You and we understand and agree that the AAA's administrative determination that this arbitration provision comports with the Consumer Due Process Protocols is final and that neither a court nor an arbitrator has the authority to revisit it. If the AAA is unavailable or unwilling to administer an arbitration in accordance with this arbitration provision, the parties will work together in good faith to agree on an arbitration organization that will do so. If the parties cannot agree, they shall petition a court of competent jurisdiction to appoint an administrator that will do so.

(*Id.*) Plaintiffs admit they browsed the Website while the Dispute Resolution Section, including the Arbitration Provision, was in place. Specifically, they state they "visited the Website to seek information about Hollister products, while located in California, on one or more occasions." (Compl. ¶¶71, 81.) When they visited the Website, they "viewed Defendants' representation" on a "popup cookie consent banner" regarding alleged tracking technologies used on the Website. (*Id.* ¶¶73, 83.) Plaintiffs allege they "clicked the manage [sic] 'Confirm My Preferences' button" and "toggled off 'Share or Sale of Personal Data' in the cookie consent preferences window." (*Id.* ¶¶74, 75, 84, 85.) Plaintiffs assert that after toggling settings in the cookie consent preferences window, they "*continued to browse the Website*." (*Id.* ¶¶78, 88.)

<u>Rewards Terms</u>. Users joining Hollister's Rewards Program via the Website see this notice:




(Monaco Decl. ¶¶15-16 & Ex. A.) Users are required to affirmatively check the box agreeing to the Rewards Terms and Website Terms to continue. (*Id.* ¶16.)

The Rewards Terms state immediately and in a distinctly separate paragraph that they expressly

"include[] the Website Terms of Use and Sale Terms." (*Id.* Ex. B at 1.)

> This is intended to describe House Rewards and the terms for participation in House Rewards, which includes the Website Terms of Use and Sale Terms (these House Rewards Terms and Conditions referred to as "Terms" or "Agreement").

(*Id.* ¶19 & Ex. B at 1.) Like the Website Terms, the Rewards Terms also prominently state, in bold font in the introduction, that they "contain[] a mandatory dispute resolution provision that includes a binding arbitration provision with a class action waiver and jury trial waiver." (*Id.* Ex. B at 1.)

Also, like in the Website Terms, the Dispute Resolution Section appears in the Rewards Terms set apart by a heading in large, bolded typeface, with a bolded note beneath instructing users to "read this section carefully" because "it may significantly affect your legal rights" and includes **"procedures for mandatory pre-dispute resolution, binding arbitration, a class action waiver, a jury trial waiver, and a provision on governing law and forum."** (*Id.* Ex. B at 10 (emphasis in original).)

The Rewards Terms include the same Dispute Resolution Section and Arbitration Provision as in the Website Terms, including defining "Dispute" with the "broadest possible meaning permitted by law," to include "any claim or controversy between you and [Hollister]." (*Id.*) The Rewards Terms also explain that an arbitrator "shall decide all issues **except**… issues that relate to the scope, validity, and enforceability of the arbitration provision, class action waiver, or any of the provisions of this Dispute Resolution section," which are reserved "for a court of competent jurisdiction to decide." (*Id.* (emphasis in original).)

The Rewards Terms contain the same set-apart "Mutual Arbitration Provision" appearing in the Website Terms, stating that "[a]ny Dispute between you and [Hollister]" not resolved through informal dispute resolution "will be resolved through binding individual arbitration… heard and determined by a single arbitrator and" and administered by the AAA. (*Id.* Ex. B at 11-12.)

Plaintiff Salinas enrolled in the Hollister House Rewards Program and affirmatively agreed to the Website Terms and Rewards Terms at least twice, on May 12, 2024 and again on July 13, 2024. (*Id.* ¶¶40-41.) It is unclear from Plaintiff Frankle's allegations regarding his use of the Website whether he enrolled as a Rewards member. (Compl. ¶71.)

<u>Sale Terms</u>. Consumers purchasing items via the Hollister website are presented with this notice:




Users must click "Submit Order" and agree to be bound by the Website Terms and Sale Terms hyperlinked directly above the notice to complete their purchase. (*Id.* ¶¶27-28 & Ex. D.) The Sale Terms state that "[i]f you have ordered merchandise via, or otherwise used or accessed, the [Hollister] Website, then your use of the… Website is subject to the Website Terms of Use." (*Id.* Ex. E at 18.)

Like the Website Terms and Rewards Terms, the Sale Terms include the same introductory language stating, in bold font, that they "**contain a mandatory dispute resolution provision that includes a binding arbitration provision, class action waiver, and jury trial waiver.**" (*Id.* Ex. E at 1 (emphasis in original).) The Sale Terms further state that:

> If you have ordered merchandise via, or otherwise used or accessed, the [Hollister] Website, then your use of the [Hollister] Website is subject to the Website Terms of Use. Any personally identifiable information that you provide to [Hollister] via the [Hollister] Website is subject to the Privacy Policy.

(*Id.* Ex. E at 18.) The Sale Terms also notify all users that by "purchasing merchandise," the purchaser "agree[s] to be bound by these terms and conditions… including the binding arbitration agreement found below with its arbitration agreement and jury trial and class action waivers." (*Id.* Ex. E at 1.)

> By purchasing merchandise, gift cards, and/or e-gift cards from Hollister Co. … via HollisterCo.com (the "Hollister Website")… you agree to be bound by these terms and conditions ("Sale Terms" or "Agreement"), **including the binding arbitration agreement found below with its arbitration agreement and jury trial and class action waivers**. Any of the following situations, among others, may be referred to as an order that was purchased from the [Hollister] Website for purposes of these Sale Terms: (i) you placed an order via HollisterCo.com (desktop or mobile); (ii) you placed an order via the Pickup in Store feature (i.e. you placed an online order to be picked up in a store) offered on HollisterCo.com; (iii) you placed an online order while in a [Hollister] store located in the United States and the order is to be fulfilled via shipment (iv) you placed an order via the [Hollister] mobile app; (v) you placed an order via an [Hollister] microsite; or (vi) you placed an order via the telephone.

(*Id.*) The Sale Terms also contain a set-apart Dispute Resolution Section identical to the Website Terms and Rewards Terms, including the Arbitration Provision. (*Id.* at 10-16.)

Plaintiff Salinas made at least **ten** online purchases on the Website between June 2024 and August 2025, each time clicking the Submit Order button and thereby agreeing to the Website Terms and Sale Terms. (*Id.* ¶¶42-43.) It is unclear from Plaintiff Frankle's allegations regarding his use of the Website whether he made online purchases. (Compl. ¶71.)

As shown above, the Website Terms, Sale Terms, and Rewards Terms (collectively, the "Terms") each inform consumers they "contain[] a mandatory dispute resolution provision" and include identical Dispute Resolution Sections, and the same Arbitration Provisions. (Monaco Decl. Ex. B at 1, 10-16; Ex. C at 1, 8-15; Ex. E at 1, 10-16.)

## ISSUE TO BE DECIDED

1. Should the Court compel arbitration of Plaintiffs' claims on an individual basis and stay this action until those arbitrations are completed pursuant to 9 U.S.C. § 3?

## LEGAL STANDARD

The Federal Arbitration Act, 9 U.S.C. §§ 1–16 ("FAA") provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As Congress has expressed a strong public policy favoring arbitration, courts must "rigorously enforce" arbitration agreements. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). Moreover, the FAA was enacted to "reverse the longstanding judicial hostility to arbitration agreements" and place "arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991); *see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). Indeed, "[b]y its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter*, 470 U.S. at 218; *see also Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 510 (9th Cir. 2023) ("Upon being satisfied of the existence of a valid arbitration agreement, the court *must* order the parties to proceed to arbitration in accordance with the terms of the agreement").

Thus, the Court's role under the FAA is "limited to determining (1) whether the agreement to

arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Pearl v. Coinbase Glob., Inc.*, 2023 WL 1769190, at *1 (N.D. Cal. Feb. 3, 2023) (Chesney, J.). "If the response is affirmative on both counts, the court must enforce the arbitration agreement in accordance with its terms." *Austin v. Lyft, Inc.*, 2022 WL 4095386, at *1 (N.D. Cal. Sept. 2, 2022) (Chesney, J.) (compelling arbitration of claims encompassed by arbitration provision in Lyft Terms of Service).

The FAA applies to any arbitration agreement that is (i) in writing and (ii) part of "a contract evidencing a transaction involving [interstate] commerce." 9 U.S.C. § 2. The FAA governs arbitration agreements that affect commerce in any way.[6] *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995) (interpreting the phrase "'involving commerce' as broadly as the words 'affecting commerce'"); *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974) ("[T]he flow of interstate commerce [includes] the generation of goods and services for interstate markets and their transport and distribution to the consumer."). Courts routinely hold the FAA applies to agreements where, as here, "the agreement expressly so provides." *In re Verisign, Inc., Derivative Litig.*, 531 F.Supp.2d 1173, 1224 (N.D. Cal. 2007); *Martinez v. Leslie's Poolmart, Inc.*, 2014 WL 5604974, at *3, n.4 (C.D. Cal. Nov. 3, 2014) (finding FAA applied where "the arbitration agreement expressly provides that it is governed by the FAA"); *Perez*, 2022 WL 2357004, at *1 (applying FAA and granting motion to compel arbitration in action brought by Plaintiffs' counsel where agreement stated "[t]he… FAA will apply to the dispute and will govern whether the dispute is subject to arbitration").

The Dispute itself need not implicate interstate commerce for the FAA to apply. *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) ("Because the statute provides for the enforcement of arbitration agreements within the full reach of the Commerce Clause, it is perfectly clear that the FAA encompasses a wider range of transactions than those actually 'in commerce'—that is, 'within the flow of interstate commerce.'"); *see also Shepard v. Edward Mackay Enters., Inc.*, 148 Cal.App.4th 1092, 1101 (2007) ("the pertinent question is whether the contract evidences a transaction involving interstate commerce, not whether the dispute arises from the particular part of the transaction involving interstate commerce."). The Dispute here nevertheless *does* implicate interstate commerce: Plaintiffs are California residents making claims

[6] "Commerce" is defined broadly in the FAA to include "commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia." 9 U.S.C. § 1.

regarding their use of the Website, and Plaintiffs agreed to the Website Terms governing that use and stating that Defendants operate the Website from offices within the State of Ohio. *See Duval v. Costco Wholesale Corp.*, 2023 WL 3852694, at *2 (N.D. Cal. June 5, 2023) (applying FAA where multi-state parties litigated claims related to "services provided… to customers involv[ing] a virtual marketplace through a smartphone application or website"); (Monaco Decl. ¶¶5-6); (Compl. ¶¶6-7).

Here, the Arbitration Provision in the Terms satisfies both conditions laid out in § 2 of the FAA: (1) it is in writing; and (2) Plaintiffs' claims are a "Dispute" within meaning of the Terms, arising out of Plaintiffs' use of the Hollister Website, and governed by the Terms, a contract that both invokes the FAA and explicitly states the parties' agreement that the Terms evidence a transaction in interstate commerce. (Monaco Decl. Ex. B at 10; Ex. C at 9; Ex. E at 10.) The Website Terms also explain that Hollister "controls this Website/App from its offices within the State of Ohio." (*Id.* Ex. C at 8.) The FAA thus governs the validity and enforceability of the Arbitration Provision in the Terms.

## ARGUMENT

### I. PLAINTIFFS ARE BOUND BY THE ARBITRATION PROVISION

Questions of contract formation involving an arbitration agreement are governed by state law principles. *See Oberstein*, 60 F.4th at 510. The Terms provide that they are "governed by the laws of the state of Ohio, United States of America, without regard to Ohio's conflict of laws rules." (*Id.* Ex. B at 16; Ex. C at 14; Ex. E at 16.) Thus, the applicable law for determining contract formation should be Ohio, whose law explicitly governs the Terms.

Plaintiffs may argue California law should apply. But no choice of law analysis is necessary because Ohio and California law do not substantially differ with respect to contract formation. *See Perez*, 2022 WL 2357004, at *3 n.1 (compelling arbitration in action brought by Plaintiffs' counsel, noting "[b]ecause the result is the same under either Ohio or California law, the Court need not resolve… whether the Court can apply the Ohio choice-of-law provision")).

As discussed below, Plaintiffs are both bound by the Arbitration Provision in the Terms.

#### A. Plaintiff Salinas Agreed to the Arbitration Provision While Signing Up For the Hollister House Rewards Program

"The first and most straightforward application of [traditional contract] principles involves so-called

'clickwrap' agreements, in which a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Oberstein*, 60 F.4th at 513.[7] "[C]ourts routinely find [clickwrap agreements] valid and enforceable because the user must affirmatively acknowledge receipt of the terms of the contract." *McLellan v. Fitbit, Inc.*, 2018 WL 1913832, at *2 (N.D. Cal. Jan. 24, 2018) (collecting cases); *see also Oberstein*, 60 F.4th at 513 ("Courts routinely find clickwrap agreements enforceable."); *Houtchens v. Google LLC*, 649 F.Supp.3d 933, 939 (N.D. Cal. 2023) ("Courts in the Ninth Circuit… acknowledge that mutual assent manifests when internet users accept 'clickwrap' agreements.").

When Plaintiff Salinas signed up for the Rewards Program, she accepted a "clickwrap" agreement containing a binding arbitration clause. Plaintiff Salinas created a Rewards Program account on May 12, 2024. (Monaco Decl. ¶40.) Before completing the account creation process, Plaintiff Salinas was presented with a Sign Up page requiring her to fill out her email address, password, name, and phone number. (*Id.* ¶40 & Ex. A.) Plaintiff Salinas was presented with a checkbox next to text that clearly stated:

> "I have read and agree to the Hollister House Rewards Terms and Website Terms of Use. For more information regarding How Abercrombie & Fitch Management Co. handles personal information, please review our Privacy Policy and Notice of Financial Incentive. By signing up you agree we may collect data about how you interact with our emails."

(*Id.* ¶40 & Ex. A. (emphasis in original)) The underlined text linked to the Rewards Terms and Website Terms containing the Arbitration Provision. (*Id.* Ex. A.) Plaintiff Salinas was required to check the box, affirmatively indicating her assent, before completing the sign-up process. (*Id.* ¶40.) In "clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available," Salinas accepted an enforceable clickwrap agreement. *Houtchens*, 649 F.Supp.3d at 939.

Plaintiff Salinas had reason to know that signing up for the Rewards Program and creating a Rewards Program account would create a continuing obligation governed by Terms. *See Oberstein*, 60 F.4th at 517 (users making online account through "full registration process" should expect "some sort of continuing relationship that [puts] users on notice for a link to the terms of that continuing relationship."); *Morrison v.*

---

[7] Under either California and Ohio law, a party is bound by a contract where "'(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.'" *Id.* at 515; *accord Mullen v. Chaac Pizza Midwest, LLC*, 2022 WL 673187, at *4 (S.D. Ohio Mar. 7, 2022) (holding that "Ohio has recognized that 'clicking' is an acceptable way to manifest acceptance to agreement terms").

*Yippee Ent., Inc.*, 2025 WL 2389424, at *2 (9th Cir. Aug. 18, 2025) ("A reasonable user subscribing to [defendant's] streaming service would have contemplated some sort of continuing relationship that prompted scrutiny of the website for any contractual obligations and terms"); *L.B. v. LinkedIn Corp.*, 2025 WL 2899514, at *9 n.7 (N.D. Cal. Oct. 10, 2025) ("[B]y entering information to book a consult… through [defendant's] website, it would be reasonable to assume that users contemplate a forward-looking relationship involving continued medical care."). Plaintiff Salinas certainly appears to have sought the benefits of the Rewards Program: as explained in greater detail below, Plaintiff Salinas made at least 10 purchases from the Hollister Website between May 12, 2024 (when she signed up for the Rewards Program) and August 27, 2025. (Monaco Decl. ¶43.)

While it is currently unclear based on Plaintiff Frankle's allegations regarding his use of the Website whether he also agreed to the Reward Terms, at the very least Plaintiff Salinas is bound by the Arbitration Provision found in the Terms because she agreed to a binding clickwrap agreement.

### B. <u>Plaintiff Salinas Agreed to the Arbitration Provision While Making Online Purchases</u>

Courts also routinely hold that sign-in wrap agreements, also called modified clickwrap agreements, "notif[y] [users] of the existence of the website's terms of use and advise [them] that by making some type of affirmative act, often by clicking a button, [they are] agreeing to the terms of service." *Moyer v. Chegg, Inc.*, 2023 WL 4771181, at *6 (N.D. Cal. July 25, 2023) (finding notice and manifestation of assent where plaintiff completed a "full registration process" with terms "located directly below the… action button"); *see also Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1020 (9th Cir. 2024) (enforcing agreement where "[d]irectly beneath the operative Play button is the following: 'By tapping "Play" I agree to the Terms of Service' or 'By tapping "Play" I accept the Terms of Use and acknowledge the Privacy Policy'"); *Pizarro v. QuinStreet, Inc.*, 2022 WL 3357838, at *2-3 (N.D. Cal. Aug. 15, 2022) (Chesney J.) (compelling arbitration where plaintiff "manifested her assent by clicking the 'See My Rates' button" and "the notice and hyperlink [to terms of use] appear directly below the 'See My Rates' button").[8]

---

[8] *See also Babaeva v. J. Crew Grp., LLC*, 2023 WL 7346079, at *1-2 (N.D. Cal. Nov. 6, 2023) (finding plaintiff bound by arbitration clause where she agreed to terms during online purchase and as member of rewards program because "courts routinely enforce contracts where (1) a consumer is expressly told that by clicking a button to complete a purchase or register on a website, they are agreeing to be bound by a set of terms of usage and (2) the website contains a link to the terms conspicuously and in proximity to the button that is clicked"); *Swift v. Zynga Game Network, Inc.*, 805 F.Supp.2d 904, 912 (N.D. Cal. 2011) (enforcing

*(cont'd)*

Here, Plaintiff Salinas made at least ten purchases from the Hollister website between May 12, 2024 and August 27, 2025, including ***two days before filing the Complaint in this case***. (Monaco Decl. ¶43.) Before placing her orders, Plaintiff Salinas was presented with underlined hyperlinks to the Sale Terms and Website Terms. (*Id.*) Directly below the hyperlinks to the Terms, Plaintiff Salinas was presented with text stating "By submitting my order, I agree to be bound by the terms and policies linked above." (*Id.* ¶27 (screenshot).) Beneath this text was a large "Submit Order" button. (*Id.*) By hitting the "Submit Order" button, Plaintiff Salinas clearly manifested her agreement "to be bound by the terms," including the Sale Terms and Website Terms that contain the Arbitration Provision.

While it is currently unclear based on Plaintiff Frankle's allegations regarding his use of the Website, whether he also agreed to the Reward Terms, at the very least Plaintiff Salinas is bound by the Arbitration Provision because she agreed to a binding sign-in wrap agreement.

### C. <u>Both Plaintiffs Are Bound By The Website Terms</u>

Plaintiffs Salinas and Frankle are both bound by the Arbitration Provision found in the Website Terms, for two independent reasons. *First*, Plaintiffs' Complaint invokes the Hollister Privacy Notice ("Privacy Policy"), which references the Website Terms (and vice-versa). (*See, e.g.*, Compl. ¶¶17, 26; Monaco Decl. Ex. C at 3 (Website Terms referencing the Privacy Policy); Ex. F at 2, 4 (Privacy Policy referencing Website Terms and Rewards Terms).) Plaintiffs cite the Privacy Policy in their Complaint to "confirm[]" that "Defendants knew that the device or devices used by Plaintiffs… to access the Website were located in California." (Compl. ¶17.) Plaintiffs likewise rely on the Privacy Policy's definition and explanation of "the third-party cookies [Defendants allegedly] used on the Website." (*Id.* ¶26.) The Complaint demonstrates that a hyperlink to the Privacy Policy was prominently placed directly adjacent to buttons that Plaintiffs allege they pressed within the popup cookie consent banner. (*See id.* ¶¶1, 27.) Plaintiffs also admit that they read text in the paragraph that contained the hyperlinked Privacy Policy, and clicked buttons below the hyperlinked Privacy Policy. (*Id.* ¶¶ 73, 83.) Plaintiffs nevertheless unconvincingly argue

---

arbitration clause where plaintiff clicked "Accept" button placed above hyperlinked statement indicating that clicking the button constituted assent to terms).

that despite relying on the Privacy Policy in the Complaint, "Plaintiffs did not read the privacy policy." (*Id.* ¶26 n.2.)[9]

Because Plaintiffs expressly reference and rely on the Website's Privacy Policy, which in turn references and appears with the Terms at the bottom of every webpage on the Website, they are equitably estopped from asserting that they are somehow not bound by the Arbitration Provision. "The purpose behind equitable estoppel is to prevent a party from relying on an agreement for one purpose while disavowing the arbitration clause of the agreement." *Bender v. Twilio Inc.*, 2025 WL 2308484, at *5 (N.D. Cal. Aug. 11, 2025) (granting motion to compel arbitration based on clause in online terms). Plaintiffs are equitably estopped in any attempt to "have it both ways" and use the Privacy Policy to "confirm[]" Plaintiffs' allegations regarding aspects of Website functionality, while simultaneously arguing that they are not bound by the Website Terms governing their use of that same Website. *Ponomarenko v. Shapiro*, 287 F.Supp.3d 816, 837 (N.D. Cal. 2018). "California courts will consider multiple writings between the relevant parties together and apply them as a whole where they make up parts of the same transaction." *Language Line Servs., Inc. v. Language Servs. Assocs., LLC*, 2011 WL 13153247, at *7 (N.D. Cal. Mar. 17, 2011); *see also* Cal. Civ. Code § 1642 ("Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together.").[10]

Plaintiffs ultimately seek to "take[] the benefit" of invoking the Privacy Policy without "bear[ing] the burden" of the Terms that incorporate the Privacy Policy and are referenced within the Privacy Policy. Cal. Civ. Code §3521; *see also DuFour v. Allen*, 2017 WL 1433303, at *9 (C.D. Cal. Apr. 20, 2017). "Equitable estoppel prevents such attempts to artfully plead around an inconvenient arbitration agreement." *Bender*, 2025 WL 2308484, at *7. Plaintiffs cannot invoke the Privacy Policy and artfully plead around their agreement to the Website Terms.

---

[9] It is axiomatic that any claim by Plaintiffs that they "may not have read" the Terms or Privacy Policy "does not undermine their assent to the terms" because "one who accepts or signs an instrument, which on its face is a contract, is deemed to assent to all its terms, and cannot escape liability on the ground that he has not read it." *Houtchens*, 649 F.Supp.3d at 942 (collecting cases).

[10] Ohio law is in accord. *See Mac Tools v. Diaz*, 2012 WL 1409395, at *5 (S.D. Ohio Apr. 23, 2012) (enforcing arbitration clause where party "[sought] a direct benefit from the contract while disavowing the arbitration provision"); *84 Lumber Co., LP v. Thompson Thrift Constr., Inc.*, 2018 WL 1393893, at *5 (S.D. Ohio Mar. 20, 2018) ("Ohio courts read all documents executed as part of the same transaction as a whole to determine the intent of the parties.").

*Second*, as this Court has recognized, in assessing adequate notice in the placement of online website terms, there is no "bright-line rule requiring [certain] design elements;" instead, courts must "examine the 'design and content' of the particular website at issue." *Pizarro*, 2022 WL 3357838, at *3 (Chesney, J.). Courts evaluate "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design in determining whether a reasonably prudent user would have inquiry notice of a browsewrap agreement." *Allen v. Shutterfly, Inc.*, 2020 WL 5517172, at *6 (N.D. Cal. Sept. 14, 2020). Another court in this District has found that displaying a pop-up cookie banner containing a hyperlinked policy—even where the plaintiff did not allege they had read or interacted with the banner—was sufficient for a finding of constructive notice. *L.B.*, 2025 WL 2899514, at *10-11 (finding constructive notice where "a reasonably prudent internet user would see the notice and understand that the continued use of the website constitutes agreement to the [policy]").[11]

Here, Plaintiffs admit that they "visited the Website" and base their claims on those visits. (Compl. ¶¶71, 81.) Indeed, Plaintiff Salinas visited the Website on multiple occasions, enrolled in the Rewards Program, and completed purchases, repeatedly agreeing to the Website Terms in the process. *Supra* at 7-8. Plaintiff Frankle similarly admits he visited the Website, although without stating whether he joined the Rewards Program or made any purchases. (Compl. ¶71.)

The Website Terms tell visitors to review the Website Terms "before using this Website[]," and advise users that those terms "apply to all visitors to, or users of, this Website[]." (Monaco Decl. Ex. C at 1.) The Website Terms further state that Plaintiffs "use of the Website[] confirm[]… acceptance of these Terms and Conditions and [Plaintiffs'] agreement to be bound by them." (*Id.*) Further, the Privacy Policy is hyperlinked at the bottom of the Hollister Website, directly adjacent to the "Sale Terms," and is located in a virtually identical position alongside the Rewards Terms and Website Terms, all of which contain the Arbitration Provision. (Monaco Decl. ¶¶22, 35.) The Privacy Policy references the Website Terms, and vice-versa. (*Id.*) Plaintiffs admit that they consulted the cookie consent banner containing the Privacy Policy hyperlink, and ***chose to continue*** using the Website. (Compl. ¶¶27, 71, 77, 81, 87.) "[A] reasonably prudent

[11] Under Ohio law, browsewrap agreements are "enforceable against a website visitor who had constructive notice of a website's terms and conditions (usually because they were prominently displayed), and repeatedly accesses that website." *Rudolph v. Wright Patt Credit Union*, 175 N.E.3d 636, 651-52 (Ohio Ct. App. 2021).

user would have been aware" that interaction with the cookie consent banner and Website constituted agreement to the Privacy Policy and Website's Terms. *Needleman v. Golden 1 Credit Union*, 474 F.Supp.3d 1097, 1103-04 (N.D. Cal. 2020) (finding inquiry notice of bank statements as "failure to view" statements online despite notice of terms "is akin to… customers failing to open one's mail and therefore disclaiming knowledge of or assent to the one-page arbitration notice"). Because Plaintiffs had, at a minimum, constructive notice of the Privacy Policy and the terms referenced therein, including the Website Terms, plaintiffs are therefore bound by the Website Terms, and the Arbitration Provision contained therein.

## II. <u>PLAINTIFFS' CLAIMS ARE GOVERNED BY THE ARBITRATION AGREEMENT</u>

Plaintiffs' claims fall within the scope of the Arbitration Provision. "[W]here the contract contains an arbitration clause, there is a presumption of arbitrability," and "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986); *see also Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 189 (2019) (observing that the Supreme Court has "repeatedly held that ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration").

Plaintiffs' claims are plainly encompassed by the Arbitration Provision. Plaintiffs agreed that the term "Dispute" is given the "broadest possible meaning permitted by law." (Monaco Decl. Ex. B at 10; Ex. C at 8; Ex. E at 10.) Plaintiffs agreed that a "Dispute" includes "any claim or controversy" between Plaintiffs and Hollister. (*Id.*) Plaintiffs likewise agreed that any "Dispute… will be resolved through binding individual arbitration." (Monaco Decl. Ex. B at 11; Ex. C at 10; Ex. E at 12.) Additionally, Plaintiffs' claims relate to their use of the Website, and as explained above, Plaintiffs agreed to the Website Terms, which contain a binding arbitration clause. *See supra* at 8. Courts routinely enforce arbitration agreements containing similar language. *See, e.g., Trout v. Comcast Cable Commc'ns, LLC*, 2018 WL 4638705, at *2 (N.D. Cal. Mar. 15, 2018) (enforcing arbitration agreement encompassing "any dispute" where dispute "given the broadest possible meaning that will be enforced"); *Guerrero v. Equifax Credit Info. Servs., Inc.*, 2012 WL 7683512, at *8 (C.D. Cal. Feb. 24, 2012) (enforcing arbitration clause encompassing "any claim, dispute, or controversy between [users] and [company]" to be interpreted "in the broadest way the law will allow it to

be enforced"); *Barnabas Clothing, Inc. v. Kabbage, Inc.*, 2018 WL 9669565, at *3 (C.D. Cal. June 8, 2018) (enforcing arbitration agreement covering "claims" as defined by the term's "broadest possible meaning").

Plaintiffs' claims are clearly governed by the Arbitration Provision, and Plaintiffs cannot avoid their contractual obligation to submit their claims to binding individual arbitration.

## III. <u>THIS ACTION SHOULD BE STAYED PENDING ARBITRATION</u>

Under the FAA, in any lawsuit "referable to arbitration," as here, the court "*shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. As the Supreme Court made clear: "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); *see also Lemberg v. San Francisco Opera Ass'n*, 2018 WL 11265549, at *1 (N.D. Cal. Jan. 19, 2018) (Chesney, J.) (granting motion to compel arbitration and staying the action pending arbitration "pursuant to § 3 of the FAA") (Chesney, J.). The plain statutory language thus "overrides any discretion a district court might otherwise have had to dismiss a suit." *Spizzirri*, 601 U.S. at 477. Because Plaintiffs' claims must be arbitrated and Defendants have requested a stay, this action should be stayed pending the outcome of any arbitration.

## <u>CONCLUSION</u>

For the reasons above, Defendants respectfully request that if the Court does not transfer this action to the Southern District of Ohio, that Plaintiffs be compelled to arbitrate their claims on an individual basis before the AAA and this action be stayed pending the outcome of those arbitration proceedings.

DATED: October 24, 2025

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ *Jason D. Russell*
Jason D. Russell

*Attorneys for Defendants,*
*Hollister Co. and Abercrombie & Fitch Co.*